COASTAL POWER INTERNATIONAL, LTD., and Commonwealth Development Corporation, Plaintiffs,

v.

TRANSCONTINENTAL CAPITAL CORPORATION and Wartsila Diesel Development Corporation, Defendants.

No. 96 Civ. 4057(LAK).

United States District Court, S.D. New York.

June 24, 1998.

As Amended June 30, 1998 and July 2, 1998.

Daniel J. Carroll, Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolucci, New York City, for Plaintiffs.

Thomas J. Hall, Chadbourne & Parke LLP, New York City, for Defendant Wartsila Diesel Development Corp.

Edward T. Krumeich, Ivey, Barnum & O'Mara, Greenwich, NY, for Defendant Transcontinental Capital Corp.

**OPINION**

KAPLAN, District Judge.

Facts ................................................................347
    Parties .............................................................347
    The La Isabela Project ..............................................348
        Structure .......................................................348
        Mooring Design ..................................................348
        The Insurance and Initial LSA Review ............................350
    The Purchase Agreement and Coastal's Due Diligence ..................351
    The LSA Problem Grows .............................................352
        LSA Refuses to Approve the Mooring ..............................353
        Coastal's Knowledge of the Issue ................................354
        The Closing .....................................................355
    Post-Closing Developments ..........................................356
    Prior Proceedings ..................................................359

Discussion ..........................................................360
    The Warranty Claims ...............................................360
        The Alleged Breaches ............................................360
        The Effect of Coastal's Decision to Close Given its Knowledge of the LSA Problem ........................................................360
    The Contract Claims ...............................................363
        Liability ........................................................363
        Causation and Damages ..........................................364
        Waiver .........................................................369
        Mitigation ......................................................370
    Attorney's Fees ...................................................370
    Prejudgment Interest ...............................................371

Conclusion ..........................................................372

A multimillion dollar transaction between huge corporations staffed by able managers and engineers, assisted by experts, and represented by able counsel—though appropriately affected by the tugs of conflicting interests—ought to be a model of competence and fair dealing. Regrettably, the deal that gave rise to this action, the acquisition by the plaintiffs for $70 million of a floating power plant in the Dominican Republic, appears to have been a model of neither.

The crux of the problem is that the windstorm insurance on the plant—a coverage of no mean significance in view of the facility's hurricane-prone location—was canceled on the day following the closing. Plaintiffs here claim that they were forced to spend almost $2 million on modifications to the plant's mooring in order to reinstate the insurance. They contend that the defendants should bear the cost on fraud and contract theories. Defendants deny liability. They contend among other things that plaintiffs were well aware of the insurance issue and the need for modifications prior to closing. They assert, moreover, that the plaintiffs have seized on what at most was a technical breach of warranty to seek to shift to the defendants the cost of modifications far more elaborate and costly than were required. As one might expect, there is a certain amount of truth on each side.

*Facts*

*Parties*

Plaintiff Coastal Power International, Ltd. ("Coastal") is a Cayman Islands corporation and an indirect, wholly-owned subsidiary of The Coastal Corporation, a publicly held Fortune 500 company. Plaintiff Commonwealth Development Corporation ("CDC") is a statutory corporation organized under the laws of the United Kingdom for the purpose of assisting overseas countries in the development of their economies. Coastal and CDC, as a result of the transaction at issue in this case, own approximately 96 percent of the issued

and outstanding capital stock of Compania De Electricidad De Puerto Plata, S.A. ("CEPP"), which in turn owns the power generating facility at issue in this case. The facility now is operated by an affiliate of Coastal.

Defendant Wartsila Power Development, Inc., formerly known as Wartsila Diesel Development Corporation ("Wartsila Power"), is a Delaware corporation with its principal place of business in Maryland. It is an affiliate of a large Finnish company, Wartsila Diesel International OY ("Wartsila OY"). Wartsila OY, through affiliates including Wartsila Power and Wartsila Diesel, Inc. ("Wartsila Diesel"), is in the business, among others, of manufacturing "turnkey" power plants. Wartsila Power's role frequently is to identify a prospective project and customer and to arrange financing in order to facilitate the sale of a plant. While Wartsila Power sometimes operates power plants on an interim basis, its objective here was to develop the project and then to dispose of its interest.[1] Thus, it served principally a development and financing role.

The remaining defendant, Transcontinental Capital Corporation ("TCC"), is a New York corporation with its principal place of business in Greenwich, Connecticut. It owned the equity in CEPP, although its position was very much subordinate to that of Wartsila Power.[2]

*The La Isabela Project*

*Structure*

CEPP owns two power generating facilities at Puerto Plata, Dominican Republic, one a 16 megawatt land based generating plant completed prior to 1992 and the other the 50 megawatt barge-based plant, known as La Isabela I, that is the subject of this litigation.

The genesis of the La Isabela I project is not entirely clear from the record, but it appears that Wartsila[3] identified CEPP or TCC as a prospective customer for such a facility and, as is typical in such transactions, played an important role in structuring a transaction in which Wartsila would design and build, and CEPP would purchase, the plant. Accordingly, Wartsila contracted with CEPP to design and build the plant and the mooring to which it would be affixed in Puerto Plata harbor, receiving in exchange a lien and security interest in TCC's CEPP stock and various other interests in CEPP and its assets.

*Mooring Design*

The mooring was designed beginning in or about February 1994 under the supervision of James Gray of Wartsila Diesel, who initially was assisted by the engineering firm of Aker Omega, Inc. ("AOI"). Gray met with Hans Treu of AOI on February 4, 1994 to discuss the project and provided him with, among other things, a report concerning the strength of the soil in the proposed mooring area, important information because the soil strength would have a direct bearing on the loads that the mooring could withstand.[4]

On February 18, 1994, AOI rendered a preliminary report in which it assumed that the storm surge and maximum water depth at the location of the barge in a 50–100 year hurricane would be 10 feet and 23 feet, respectively, and based its advice on maximum wind speed of 118 mph.[5] It recommended a mooring consisting of a number of piles to which the port side of the barge would be moored by pile guide frames that would fit over the piles, thus allowing the barge to rise and fall with the water level.[6] The report noted, however, that the soil strength information provided to AOI by Wartsila Diesel was not adequate to complete the mooring design.[7]

1. Tr. 210–11.

2. *Id.* 211.

3. "Wartsila" refers generally to Wartsila OY and its affiliates where greater specificity is not required.

4. The soil strength data provided at the meeting was PX 3. Treu regarded it as inadequate be-
cause the borings upon which its conclusions rested were not made to sufficient depths. Treu Dep. (PX 601) at 44–51.

5. PX 4, at 1–2.

6. *Id. passim.*

7. *Id.*

Gray spoke with Treu a few days later concerning the preliminary report. Based on information from another consultant, a Dr. Herbich of Texas A & M, Gray argued that the design should be based on a storm surge of 8 to 9 feet and that the appropriate wind speed assumption was 100 mph. He promised additional soil information.[8]

Following the receipt of further soil strength data from another consultant to Wartsila Diesel, AOI rendered a revised report based on the 9 foot storm surge and 100 mph wind speed assumptions urged by Gray.[9] But AOI made clear that the soil data upon which its calculations were based still were inadequate because the piles would be driven to a depth greater than that to which borings had been made. Further, it cautioned that it had not yet received Dr. Herbich's report and was uncomfortable with the wind and wave assumptions. It "strongly recommend[ed] that better and deeper soil borings be obtained before the pile design is finalized" and pointedly inquired whether Wartsila Diesel would accept responsibility for the environmental criteria used in the load analyses and for the inadequacy of the soil information.[10]

Shortly thereafter, Wartsila sent AOI Dr. Herbich's report concerning environmental conditions. The report, however, was not site specific. It gave general information concerning significant wave heights offshore, but it failed to provide information concerning maximum wave height at the proposed location of the barge, which of course was among the important questions driving the design of the mooring. Treu then spoke with Gray in early March 1994, concluding on the basis of that conversation that Wartsila would take responsibility for the environmental loading assumptions used in the design.

He did not question them further.[11] By the end of March, however, AOI's role in the design of the mooring ended.[12] Wartsila Diesel completed the design, which did not employ all of AOI's recommendations,[13] and construction began.

While this narrative suggests that Wartsila Diesel wilfully ignored competent engineering advice in the expectation that it quickly would sell the plant and pass any problem on to the buyer, the reality arguably is more nuanced. As Treu suggested, there is an inverse relationship between storms of a given intensity and their probability—storms of common intensity occur frequently and intense storms only infrequently at any given location.[14] When designing a facility that will be subjected to storm conditions, one takes into account both the expected useful life of the facility—the shorter the useful life, the less likely that the facility will be subjected to extreme conditions—and one's level of aversion to risk.[15] Treu testified, for example, that fixed facilities located in the Gulf of Mexico with useful lives of greater than five years are designed to withstand 50 or 100 year conditions[16] while rigs that are moved frequently often are designed to withstand only 10 year conditions.[17] Implicit, of course, are the propositions that (1) even the most stringent design criteria cannot guarantee against all loss, as improbable conditions do occur, and (2) the choice of any particular design criteria involves a cost-benefit analysis in which the owner weighs the added cost of building to more stringent criteria against the possible loss, discounted by its improbability. Thus, Wartsila's decisions may have been judgments that would have been reasonable for a long-term owner of the facility[18] or they may have been colored by its

8.  PX 5.

9.  PX 8. The report also assumed maximum wind speed of 130 mph only on the port beam.

10.  *Id.* at 3–4.

11.  Treu Dep. (PX 601) at 109–13.

12.  *Id.* at 139.

13.  *Id.* at 37–38.

14.  *See id.* at 81–83.

15.  *Id.* at 81–83, 113–14.

16.  I.e., conditions likely to be encountered once in 50 or 100 years.

17.  *Id.* at 82.

18.  *See also, e.g.,* PX 19, ¶ 3.

short-term self interest,[19] although nothing ultimately turns on this.

As ultimately constructed, the original mooring at Puerto Plata consisted of five 90 foot piles driven approximately 45 to 52 feet into the subsoil beneath the barge. The barge was affixed to the piles by pile frame guides. There were three principal factors determining the security of the mooring system. The first was the height of the pilings above the bottom, which determined the maximum height to which the water could rise without the pile frame guides rising above the piles and thus freeing the barge from the mooring.[20] The second was the inherent strength of the piles themselves, which determined the lateral force that could be placed upon the barge by wind and wave without snapping the piles. The third was the resistance of the piles to displacement as a result of the application of force by a wind- and wave-driven barge, which in turn depended principally upon the length of the piles, the depth to which they were driven, and the strength of the subsoil.

The barge was completed, floated to the Dominican Republic, and installed at the mooring in April 1994.[21] On November 18, 1994, CEPP entered into financing arrangements with an indenture trustee and the Maritime Administrator ("MARAD") of the Department of Transportation pursuant to which it granted the Secretary of Transportation a security interest in La Isabela I and covenanted that it would keep the vessel insured against certain risks.[22]

*The Insurance and Initial LSA Review*

At the time of the installation of La Isabela I, Wartsila obtained various insurance coverages for the barge, including a hull and machinery policy underwritten by syndicates at Lloyds of London. The initial term of the policy, which included coverage for windstorm damage, had an expiration date of July 10, 1995.[23] The underwriters, however, conditioned the continuation of the policy upon a survey by the London Salvage Association ("LSA"), a marine warranty surveyor, compliance with any LSA recommendations, and approval by the LSA of the mooring arrangements.[24] Moreover, they retained the right to terminate the windstorm coverage, effective June 1, 1995, absent such LSA approval.[25]

A representative of LSA observed the installation of the barge in April 1994[26] and the driving of the piles.[27] On May 4, 1994, he requested information regarding the design parameters and engineering calculations for the mooring.[28] On September 22, 1994, another LSA surveyor visited the site.[29] In a report dated September 23, 1994, the surveyor advised Wartsila that it wished to review the final "as installed" mooring arrangement design and plans as well as the design calculations and parameters, including information showing allowance for hurricane conditions and surge. The report further cautioned that review of this information might lead to "further recommendations concerning mooring."[30] Days later, Wartsila's insurance broker emphasized the importance of complying with LSA's requests.[31] And this was but the start of a lengthy series of LSA requests which, for the most part, went unanswered by Wartsila:

● In a further report dated October 7, 1994, LSA again requested engineering cal-

19. *See, e.g., id.* ¶ 8.

20. Tr. 233–34.

21. Amended Pretrial Order ("PTO"), § III, ¶ 42. (All subsequent references to the PTO, unless otherwise indicated, are to Section III, which contains stipulations of fact.)

22. PX 184 *passim*, especially recitals and Ex. 1, § 2.07(b).

23. DX DDDDD, ¶ 5.

24. *Id.* ¶ 6.

25. *E.g.*, PTO ¶¶ 31, 57.

26. PTO ¶ 42.

27. PX 50, at C09529.

28. *Id.* ¶ 43.

29. *Id.* ¶ 44.

30. *Id.* ¶ 45; PX 29.

31. PX 178.

culations and information regarding design parameters.[32]

• On October 20, 1994, LSA's New York office conveyed to CEPP—which was operated at the time by Wartsila—an extensive request for additional information. It sought, among other things, engineering plans of the piles, design calculations, details of the location and orientation of the moored barge including water depths, calculations of the strength limitations of the barge against wave loads and, most significantly, information regarding the philosophy of the wind and wave design criteria selected for the mooring. It carefully explained that the wave height employed by Wartsila appeared unduly small and indicated that "[m]eteorological data for wind and waves *in the area* ... would be useful."[33] LSA thus made clear that it needed site specific meteorological and oceanographic data.

There is no evidence of any meaningful response to these requests during at least the period October 1994 through February 1995.[34]

*The Purchase Agreement and Coastal's Due Diligence*

Although TCC was the record owner of the stock of CEPP, its interest was heavily mortgaged to Wartsila, which therefore had a substantial incentive to bring about a sale of the company. In or about September 1994, Wartsila began discussions with Coastal concerning the sale of CEPP to Coastal,[35] discussions which culminated in an acquisition agreement dated as of December 30,

1994 (the "Purchase Agreement")[36] pursuant to which Coastal and affiliates and CDC agreed to buy and TCC agreed to sell all of the issued and outstanding capital stock of CEPP for total consideration, payable principally to Wartsila, of approximately $70 million.[37] Although TCC nominally was the seller, both TCC and Wartsila Power made representations and gave warranties to the buyer, the accuracy of which as of the closing date was a condition precedent to Coastal's obligation to buy.[38]

The structure of the representation and warranty provisions of the Purchase Agreement and their relationship to another aspect of the contract are noteworthy. Perhaps reflecting the fact that Coastal is an affiliate of a Fortune 500 company with access to every type of expertise relevant to a transaction such as this, Wartsila and TCC made no representations or warranties concerning the condition or design or engineering characteristics of La Isabela I or the mooring. The Purchase Agreement instead obligated both Wartsila and TCC, "[u]p to and including the Closing Date, to give Coastal and its authorized representatives virtually unlimited access to CEPP, its assets, and books, records and information relating thereto."[39] The representations and warranties thus were quite limited, the most significant for purposes of this action being representations and warranties:

• By TCC that "[s]ince the Review Date [November 30, 1994], except as set forth in the Disclosure Schedule or to the ex-

**32.** PX 176. It appears from PX 258 that some information was provided in response to this request, although its nature is not entirely clear from the record. In any case, the evidence makes plain that Wartsila did not adequately respond.

**33.** PX 258 (emphasis added).

**34.** *See* PX 165 (Feb. 7, 1995 memorandum from LSA complaining that little of the information requested on Sept. 23 and Oct. 20, 1994 had been provided).

**35.** DX DDDDD, ¶ 7.

**36.** PX 1. There is some ambiguity in the record as to the date on which the Purchase Agreement actually was signed. The agreement recites that it was signed on December 30, 1994. *Id.* 1, 59.

Wartsila's Russin testified that it was "finalized and initialed" on or about December 30, 1994. DX DDDDD, ¶ 7. TCC's Gonzalez–Bunster stated that it was executed at the closing on May 31, 1995. DX HHHHH, ¶ 19. The Court finds that it was executed on or about December 30, 1994.

**37.** *Id.* §§ 2.1–2.3; PX 500, ¶ 3 (amount). Of the total purchase price, $24 million was paid in cash, the great bulk of it to Wartsila. PX 500, ¶ 3.

Subsequent to the closing, a TCC affiliate acquired and continues to own a four percent interest in CEPP. DX HHHHH, ¶ 2.

**38.** PX 1, §§ 9.1–9.2.

**39.** *Id.* §§ 6.7, 7.2.

tent otherwise consented to by Coastal in writing, there has not been any ... [o]ther event or condition of any character ... that has or could reasonably be expected to have a Material Adverse Effect on CEPP." [40]

- By TCC and Wartsila Power that "[e]xcept as disclosed in this Agreement or in the Disclosure Statement there is no fact, circumstance or condition which does or could reasonably be expected to have a Material Adverse Effect on CEPP or any member of the Coastal Group." [41]
- By TCC that "[e]xcept as set forth in the Disclosure Schedule ... no event has occurred which, with the passage of time or the giving of notice, would constitute a default by CEPP ... under any Contract or Permit, or would permit modification, acceleration or termination of any Contract or Permit." [42]

In addition, both TCC and Wartsila Power gave a number of covenants to the buyer. So far as is relevant here, TCC covenanted that, from the date of the Purchase Agreement to and including the closing date, it would:

- not agree to or suffer, nor permit CEPP to agree to or suffer, any transaction or condition that could reasonably be expected to have a Material Adverse Effect on CEPP. [43]
- use its best efforts to preserve intact the existing business relationships of CEPP with suppliers, customers, distributors and others. [44]
- give prompt written notice to Coastal of any notice alleging the occurrence of "any ... event which with the giving of notice, the passage of time or both would

reasonably be expected to constitute a breach or default, with respect to any Contracts ... of CEPP" or "which would result in ... any of Seller's representations or warranties ... being or becoming inaccurate or misleading in any material respect." [45]

Wartsila Power, for its part, covenanted that it would use its best efforts to cause CEPP to comply with and itself "take such action within its power to perform the covenants set forth in *Section 6* [covenants of TCC] hereto." [46]

The Disclosure Schedule furnished in connection with the acquisition agreement contained an insurance summary that indicated that a condition of the hull and machinery insurance for La Isabela I was compliance with all LSA recommendations regarding, and approval by LSA of, the mooring arrangements. Coastal thus was well aware of these requirements prior to closing. [47] Moreover, it knew that provisions such as this could result in the need to make major modifications to the mooring. [48] Nevertheless, while it conducted some due diligence, [49] it sought no information regarding the mooring or its design. [50]

*The LSA Problem Grows*

LSA evidently became frustrated with Wartsila's prolonged failure to respond to its requests. As previously noted, it wrote to Wartsila on February 7, 1995, attached its October 20, 1994 information request, and complained about the lack of response. It noted, among other things, that no design criteria had been provided and that mooring criteria for hurricane conditions still were not

---

**40.** *Id.* § 3.6(xiii).

**41.** *Id.* §§ 3.37, 4.9.

**42.** *Id.* § 3.17.

**43.** *Id.* § 6.1. The Purchase Agreement is convoluted but clear on this point. TCC undertook in Section 6.1 not to permit CEPP to agree to or suffer any transaction or condition proscribed in Section 3.6. As noted above, Section 3.6(xiii) referred to events or conditions that reasonably could be expected to have a Material Adverse Effect on CEPP.

**44.** PX 1, § 6.4.

**45.** *Id.* § 6.5.

**46.** *Id.* § 7.1.

**47.** PTO ¶¶ 34–41; DX B, fifth page.

**48.** Tr. 84.

**49.** *Id.* 24–26; DX V.

**50.** Tr. 217; *see id.* 24–26; DX V.

available.[51] Significantly, it helpfully suggested that Wartsila would be aided "by getting the services of a Marine Consultant / Naval Architect who would first ascertain the worst weather scenario, i.e. hurricane winds and storm tide, and match these against the existing mooring system."[52]

This communication appears finally to have prompted Wartsila to action, although Wartsila never followed LSA's recommendation to hire a competent marine consultant or naval architect. Later that month, it assigned a young engineer to spend some time providing information to the insurance broker for use in responding to LSA.[53]

On February 28, 1995, AOI, which had been engaged again, this time to perform an as-built design review of the mooring system, rendered its preliminary report. The report—which was based principally on the soil strength, wind, and maximum wave assumptions used previously—concluded that the pile guide frames were inadequate for the estimated loading and recommended changes to them.[54] On instructions from Wartsila's Alex Russin,[55] Gary Reinschof McGriff, Seibels & Williams, Wartsila's insurance broker for La Isabela I,[56] forwarded the report to LSA on March 2, 1995 and requested its assistance in obtaining an extension from the underwriters to modify the guide frames.[57] A short time later, AOI rendered its final report, stressing once again that the soil strength assumptions upon which the mooring design was based were inadequate.[58] But this fell far short of responding to LSA's requests.

On March 15, 1998, LSA's New York office forwarded to Reinsch a memorandum from its London office which complained that most of the questions raised in LSA's October 19, 1994 memorandum still had not been answered and raised a number of additional issues concerning the AOI as-built report.[59] While AOI promptly responded on a number of points, LSA advised Wartsila through Reinsch that AOI's response neither addressed the open questions remaining from LSA's October 19, 1994 memo nor satisfied LSA on the points it did address.[60]

On March 28, 1995, Wartsila responded more fully to the questions concerning the AOI report that LSA had posed in its March 15, 1995 memo, enclosing additional supporting data.[61] Two days later, LSA responded that the information had gone a long way, but not far enough. It sought additional information concerning certain of the AOI work. More importantly, however, it pointed out yet again that the information it had sought in its October 19, 1994 memo—more than five months before—concerning selection of the design wave criteria and the strength limitations of the barge against wave loads still had not been provided.[62]

These exchanges prompted a conference call among Wartsila, AOI and LSA. On April 4, 1995, following that call, LSA advised Wartsila through its broker that "the use of only a 9 foot wave for the wave force calculations has not been justified" and that "wave loads in excess of this could be experienced in severe hurricane conditions." It insisted that the extreme design conditions for wind and sea loading be reassessed and pointed out that "the choice of realistic environmental data is essential to the design of the mooring system and any necessary strengthening of the barge or the superstructure."[63]

*LSA Refuses to Approve the Mooring*

In the days that followed, Wartsila and the broker scurried about in an effort to come up

51. PX 165.

52. *Id.* at 3.

53. PX 600 (Schon Dep.) 7, 22–25.

54. PX 84, third and following pages.

55. DX DDDDD, ¶ 13.

56. *Id.* ¶ 10.

57. *Id.,* at 1–2.

58. PX 253.

59. PX 262 (10/15/94 memorandum).

60. *Id:* (3/28/95 and 3/24/95 memoranda).

61. PX 86.

62. PX 212.

63. PX 87.

with justification for the environmental loading criteria. They provided a certain amount of information to LSA, none of which was specific to the particular site of this facility.[64] But on April 13, 1995, LSA advised Wartsila and McGriff, Seibels that the information provided thus far was inadequate and that it could not approve the mooring until its concerns were resolved.[65]

LSA's concerns were quite specific. It objected that the 9 foot wave height used to design the mooring was a significant wave height rather than the maximum wave height that could occur during a storm, that Wartsila had not provided information showing the frequency of occurrence of differing hurricane intensities nor provided any rational basis for selecting the particular hurricane intensity used for design purposes, that the use of a 9 foot wave height was inconsistent with one of the maximum wind speed assumptions, and that the information provided appeared to confuse storm surge with wave height.[66] It indicated that Wartsila "has not provided statistical data showing the frequency of occurrence of the different hurricane intensities nor have they provided any rational basis for selecting the level of hurricane intensity that should be used for design purposes." [67]

When LSA's concerns were not addressed to its satisfaction, it advised McGriffs Reinsch on May 10, 1995 that it would "not approve the mooring arrangement for this barge beyond 1 June, 1995." [68] It emphasized that "[d]ocumentation requested has not been presented relative to the criteria in use and the strength of the barge, and we believe in practical terms this system cannot be made to provide an adequate hurricane mooring." [69]

*Coastal's Knowledge of the Issue*

After Reinsch received LSA's May 10 fax, Russin told him to advise Coastal of the situation.[70] Reinsch therefore called Ken Smith of Coastal's risk management department and filled him in.[71] On May 12, 1995, Smith sent an e-mail to Coastal's in-house counsel, the head of the risk management department, and other executives which read:

"I have learned of an insurance issue which you should be aware of:

"A & A in Baltimore originally placed the Hull coverage on the CEPP barge. At that time the lead underwriter warranted that windstorm coverage would be contingent upon the Moorings being approved by the London Salvage Association (LSA).

"The LSA has still not approved the Moorings. The underwriters have confirmed to McGriff (the current insurance broker) that windstorm coverage is still in effect, however the current suspension of the warranty will expire June 1.

"The LSA's position is that the design and execution of the Moorings won't be able to withstand the type of hurricane to which the Dominican Republic is subject. Wartsila designed the Moorings for a 9 ft. wave and 100–120 mph wind. The LSA doesn't agree with these parameters, their naval architect wanting the design to withstand a 100yr. storm.

"The underwriter's [*sic*] have said that they might remove the warranty if sufficient data is presented. McGriff has been working for months accumulating data. They know that there have been 496 documented hurricanes in the last 100 years and 17 of these have touched the DR. The barge is located in a protected bay and a mountain protects the harbor on the south side. The location is the lee side of the island so if a vessel was to tie up to ride out a storm, this is where it would go. They also contend that the underwriter's [*sic*] charge a premium for the risk and

---

64. *E.g.,* PX 89.

65. PX 275. The document is dated April 13, 1994, but the year clearly contains a typographical error and should read "1995," as does the fax transmission line at the top of the document.

66. *Id.*

67. *Id.*

68. PTO ¶ 48; PX 100.

69. *Id.*

70. DX DDDDD, ¶ 13.

71. *Id.* ¶¶ 52–55.

windstorm is contemplated in their premium.

"McGriff expects to hear a decision from the underwriters this coming Monday or Tuesday.

"If the underwriters won't lift the warranty requirement our purchase terms should reflect the additional cost we might incur to bring this Moorings into compliance with the LSA's standard. I don't know the extent of the cost.

"McGriff says the LSA has not given specific recommendations, only saying that the present situation is not acceptable and the design should be for a 100 year storm." [72]

Four days later, Michael Rauch, director of risk management for The Coastal Corporation, informed Mario Hurtado, Coastal's project manager for the acquisition,[73] and others of the problem, including the June 1, 1995 deadline. He advised that it was "highly unlikely" that LSA would alter its view, counseled against Coastal self-insuring the windstorm risk, and recommended that Coastal insist that Wartsila bear any costs associated with upgrading the mooring to satisfy LSA, either directly or as an adjustment to the purchase price.[74]

*The Closing*

Between May 12 and the closing, Russin and Reinsch discussed the insurance situation with Hurtado and his superior, Mark Barry. Russin, who believed that the problem could be worked out by an increase in the premium or the deductible even if LSA adhered to its position, told the Coastal representatives that he was confident that a solution could be reached.[75] Coastal, alleg-

edly because it viewed the matter as "just another open warranty issue," [76] did not suggest that the mooring be tested or reviewed, analyze the strength of the mooring, or quantify the implications of LSA's position.[77] In the meantime, efforts relating to the LSA continued.

On May 22, 1995, Wartsila received a report from a consultant, A.H. Glenn, containing site specific information regarding 100 year storm wind, tide, and wave characteristics at Puerto Plata Bay.[78] The Glenn report, although Russin characterized it as "not ... too bad," was quite troublesome to Wartsila. It reported one hour winds as 131 mph and total wave height (astronomical tide plus storm tide plus wave height) as 15.1 feet in a 100 year storm in Puerto Plata Bay, which were far in excess of that assumed by Wartsila. Russin, who disagreed with it in some respects [79] and appears to have misunderstood it in others,[80] sent it on to Reinsch with the suggestion that it should be "properly presented before sending it on to [the] insurance company," [81] presumably a reference to LSA. But the Glenn report was not disclosed to either LSA or to Coastal before the closing.[82]

In any case, on May 26, 1995, LSA once again advised Reinsch that its objections had not been resolved fully.[83] It remained concerned with "the adequacy of some of the assumptions used by Wartsila regarding the worst environmental loading" and indicated that any "way forward" would "involve significant re-design or enhancement of the mooring system arrangements, rather than simply

---

72. PTO ¶ 54; PX 24.

73. DX DDDDD, ¶ 13; PTO ¶ 59.

74. PTO ¶¶ 57–59; DX F.

75. DX DDDDD, ¶ 15; Tr. 30, 212–14, 230, 236; PX 603, at 140.

76. Tr. 30.

77. *Id.* at 30, 83–84; DX DDDDD, ¶ 15.

78. PX 114.

79. Tr. 240.

80. It is difficult to see how Russin could have concluded that the report did "not look to bad." The Court finds that he focused only on the reported 7.8 foot wave height without appreciating that that figure had to be added to the total tide in order to determine the maximum height to which the water level would rise in extreme conditions.

81. PX 112.

82. Tr. 240.

83. The pile guide frame problem was remedied in May 1995. Tr. 218; PX 25, third page; PX 113; *see* PX 116.

further engineering on what is presently installed."[84]

The transaction closed on May 30, 1995, effective the following day.[85] The parties were represented by major law firms.[86] Although Coastal raised a number of other issues at the closing, all of which were resolved, it did not bring up the insurance problem.[87] According to Coastal's Barry, he was aware prior to the closing that modifications would have to be made to the mooring in order to satisfy LSA. He was aware too that the facts set forth in Smith's May 12 e-mail and Hurtado's May 16 memorandum were not listed on the Disclosure Schedule and therefore arguably were within the scope of the Wartsila warranties. Despite Rauch's recommendation that Coastal seek Wartsila's agreement to bear the cost of modifications or, alternatively, a reduction in the purchase price, Barry deliberately chose not to raise the issue of the continuation of the windstorm coverage at the closing, allegedly in the belief that the cost of the necessary modifications would be Wartsila's responsibility.[88]

*Post–Closing Developments*

On June 1, 1995, the day following the closing, the windstorm coverage on La Isabela I terminated,[89] although Coastal later that month succeeded, upon payment of an increased premium, in obtaining reinstatement of the windstorm coverage pending the implementation of the LSA modifications and Coastal's agreement to make whatever modifications LSA might insist upon after a further joint review.[90] On the same day, LSA informed McGriff, Seibels, which had become Coastal's broker for the La Isabela project, of its requirements for approval of the mooring arrangements. It insisted that the mooring be capable of bearing the loads associated with maximum sustained winds of 130 mph, tide plus storm surge of 2.8 meters above mean sea level, and maximum wave height of 3 meters as well as satisfaction of other design factors intended to provide a margin of safety.[91] It recommended that additional piles be installed and the height of existing piles increased.[92] Although it offered to consider suitable alternatives,[93] it is worth noting that the magnitude of the increase in the environmental criteria reflected LSA's pique at what it perceived as Wartsila's failure to be more forthcoming with information.[94] It admitted at trial that the criteria that it would have employed in determining whether to approve the mooring had it been happy with Wartsila's cooperation would have been "subject to negotiation," that it might have approved Wartsila's criteria, and that it would have considered any reasonable proposal.[95]

Coastal raised the problem in a June 12, 1995 conference call with Wartsila, Treu of AOI and a representative of LSA.[96] It claims, among other things, that Wartsila's Russin then agreed that Wartsila would bear the cost of necessary modifications.[97] Although there appears to have been inconclusive discussion concerning the possibility of Wartsila sharing in the cost of modifications estimated

**84.** PTO ¶¶ 49–50; PX 116.

**85.** The transaction closed as between all of the parties except CDC on May 30, 1995. CDC became a party on the following day. PTO ¶ 9.

**86.** Coastal was represented by Akin, Gump, Strauss, Hauer & Feld L .L.P., Wartsila by Chadbourne & Parke, and TCC by Shaw, Pittman, Potts & Trowbridge. PTO ¶¶ 67–68.

**87.** DX DDDDD, ¶ 16.

**88.** Tr. 47–52; *see* PX 603, at 117–18; PX 500, ¶ 5.

**89.** PX 501, ¶ 3.

**90.** PX 501, ¶ 3; PX 67 (6/13/95 letter); Tr. 110; PX 186.

**91.** PX 119; *see also* PX 42. The wind criterion was virtually identical to the maximum one hour wind in a 100 year storm indicated by the Glenn report. The maximum wave height of 5.8 meters (tide plus surge plus waves), or 19.1 feet, was greater than indicated in the Glenn report.

**92.** PX 119.

**93.** *Id.*

**94.** *Id.* 136–38.

**95.** *Id.* 137–39.

**96.** PX 501, ¶¶ 4–5;

**97.** *E.g.*, PX 67, at 1 ¶ 2; PX 501, ¶ 5.

to cost no more than $400,000 or otherwise "mak[ing] the situation right,"[98] the Court finds that Russin made no commitment.

Not surprisingly, once the windstorm coverage was terminated and LSA had delivered its recommendations, Coastal concluded that the problem was more serious than it had believed prior to closing.[99] It promptly obtained two internal estimates that placed the cost of the changes necessary to meet LSA's requirements in the range of $350,000 to $500,000, and it tried to persuade LSA to change its design criteria.[100] Some time in the June—July period, in connection with the renewal of the policy for the period following July 10, 1995, however, Coastal agreed to begin a program to bring the mooring up to LSA's standards.[101] Its first step toward that goal was to retain AOI to redesign the pile system to meet LSA's requirements.[102]

AOI promptly advised Coastal that it had been concerned from the start about the validity of the soil strength data that had been provided to it by Wartsila.[103] It retained MARSCO, Inc., a marine soil consultant, to advise.[104] MARSCO did two test borings to depths much greater than those to which the original piles had been driven and concluded that the strength of the soil surrounding the original piles was considerably weaker than Wartsila had assumed.[105]

MARSCO's conclusion concerning soil strength was a bolt from the blue to both Coastal and LSA, although it should have surprised neither. Coastal made no effort prior to the closing to obtain any information regarding the strength and adequacy of the mooring despite the fact that the continuation of the insurance was conditioned upon LSA approval. Indeed, it failed to do so even after LSA withheld approval prior to the closing. LSA, for its part, sought no information regarding soil strength prior to being informed of the results of the MARSCO analysis after the closing,[106] this despite having been informed in March that the design had been based on assumed rather than actual soil conditions.[107] Nor did its June 1 conditions relate in any way to the soil issue.[108]

By December 1995, AOI and MARSCO together concluded—in significant measure as a consequence of the new soil strength information—that the upgrade of the mooring would require (1) lengthening of the existing piles and driving them to considerably greater depths, and (2) the addition of new piles.[109] Coastal thereupon recommended to the CEPP board that the modifications be

---

**98.** PX 218; *see* DX DDDDD, ¶ 18; PX 44 (3/15/96 letter by Barry to Wartsila makes no mention of alleged commitment by Wartsila to pay cost of modifications); PX 25 (6/22/95 Curran memorandum reporting that Coastal asserted that Wartsila agreed to share in cost); PX 67, at C06876, ¶ 2; PX 75; PX 78 (2/16/96 Coastal letter inviting Wartsila to discuss reimbursement rather than asserting prior agreement).

**99.** Tr. 32; PX 501, ¶ 6.

**100.** *Id.* 33, 63. Coastal communicated the $400,000 estimate to Wartsila and indicated that it regarded the cost of the upgrade as Wartsila's responsibility. Wartsila rejected that assertion. DX DDDDD, ¶ 18.

**101.** *Id.* 35–36; *see* PX 67.

**102.** *See* Tr. 35; PX 72; PX 501, ¶ 6.

**103.** PX 72, at C06645.

**104.** *Id.*

**105.** *Id.*; PX 306; PX 307; PX 500, ¶ 7.

**106.** PX 87; PX 100; PX 116; PX 119; PX 212; PX 275; *see* Tr. 146–50, 152–54.

**107.** PX 84, third and following pages; DX DDDDD, ¶¶ 10, 13; Tr. 151–52.

**108.** PX 119.

LSA's witness claimed at trial that LSA would have considered soil strength had it received the design criteria from Wartsila. Tr. 139–40. This contention rings hollow in light of the fact that LSA did not inquire concerning soil conditions when it fixed its own performance criteria on June 1 in frustration at the failure to obtain those criteria from Wartsila. Nor does it make sense in view of LSA's admission at trial that Wartsila's design criteria could be deduced by a competent engineer from information that Wartsila did provide. *Id.* 143–46. The Court finds that LSA overlooked the possible divergence between the soil assumptions upon which it knew the design was based and the actual conditions and that its trial testimony was an unpersuasive effort at self exculpation.

**109.** PX 20, at W003612; PX 307, at 10; PX 73.

made. The recommendation was approved, and Weeks Marine was engaged in February 1996 to do the work at an ultimate cost to CEPP of $1,492,018.25.[110] The total cost, including engineering fees and other expenses, exceeded $1.6 million.[111] The difference between the $350,000 to $500,000 estimates that Coastal received in early June 1995 and the actual cost of the work ultimately done was attributable to the fact that the soil into which the piles had been driven was weaker than Wartsila had assumed when the original mooring was designed.[112]

At about the time that Weeks Marine was engaged, Coastal advised Wartsila that it intended to make modifications to the mooring at a cost of approximately $1.7 million.[113] Shortly thereafter, Wartsila advised Coastal's Barry that Johnson & Higgins ("J & H"), a well known insurance broker that was bidding on coverage for another Wartsila facility, was confident that it could place competitive coverage for La Isabela, that it had identified two other surveyors who would be utilized by the alternative underwriters, and that it wished to conduct a survey of the plant in order to finalize a proposal.[114] Wartsila suggested setting up a meeting to discuss the possibilities. Accordingly, Coast-al, Wartsila and J & H representatives met on March 29, 1996.[115]

By the date of the meeting, J & H had obtained a firm lead quotation from underwriters to provide the windstorm coverage at competitive premiums without a survey, although a survey would have been helpful in achieving the lowest possible premium.[116] J & H opened the meeting by telling Coastal that it had a lead underwriter willing to write the coverage without making any modifications to the mooring and requested Coastal's cooperation in having J & H arrange for a survey so that the proposal could be finalized.[117] Barry of Coastal responded that Coastal did not wish J & H or Wartsila to take any further steps in this regard.[118] He explained that insurance no longer was the issue, as the post-closing findings concerning soil strength had led Coastal to determine that it wished to bring the mooring up to "Coastal standards" independent of insurance requirements.[119] He rejected J & H's request to send a surveyor to inspect the mooring.[120] Moreover, the Court finds that Coastal on at least three occasions rejected overtures from insurance brokers who asked that they be allowed to seek alternative insurance programs that well might have avoided the need for modifications, or at least

---

110. PX 501, ¶¶ 8–10. Moreover, LSA's presence during the driving of the original piles presumably should have alerted it to the weakness of the soil. *See* PX 72, at C06645, ¶ 2.0 (driving records of original piles seemed to show much weaker soil).

111. CEPP spent an additional $332,646.30 in connection with the mooring modification, principally for engineering fees. PX 400.

112. The two estimates in the $350,000 to $500,000 range were obtained before anyone knew that the soil strength was less than Wartsila had assumed in designing the mooring. Tr. 59, 63. To the extent that they were accurate, they therefore reflected what it would have cost to bring the mooring up to LSA standards absent the subsequent discovery of the soil strength issue.

Coastal sought to undermine the credibility of these estimates by presenting them as rough, back-of-the-envelope guesses. A $400,000 estimate, however, was provided by Mr. Gray, who had designed the mooring for Wartsila, was fully familiar with the environmental loading and related issues, and had become an employee of Coastal by this date. *See id.* 63–64; DX KKKKK (Gray Dep.) 63. Moreover, plaintiffs' expert testified that the cost of modifications necessary to meet LSA's requirements, had the soil conditions been as Wartsila assumed, would have been about one third to one half the ultimate cost. Tr. 127–28. In all the circumstances, the Court finds that the cost of bringing the mooring up to LSA's requirements, assuming that the soil strength had been as great as Wartsila initially assumed, would not have exceeded $500,000.

113. Tr. 43; PX 78.

114. DX Y.

115. Tr. 65; DX CCCCC, ¶¶ 7–8.

116. DX GG; DX MMMMM (Spiller Dep.) 261–66.

117. Tr. 43, 60–62, 248; DX MMMMM (Spiller Dep.) 267; DX CCCCC, ¶ 8.

118. DX WWWW.

119. *See* Tr. 44–46: DX CCCCC, ¶ 8.

120. Tr. 62, 248; DX MMMMM (Spiller Dep.) 266–67.

modifications as extensive as those Coastal chose to make.[121] Indeed, Coastal elected not to seek another surveyor although it was advised that the position taken by LSA was unreasonable and that another surveyor might have obviated any need to modify the mooring.[122]

Coastal sought to explain its failure to pursue the possibility of other insurance by contending that its primary focus was to obtain reinstatement of the windstorm coverage as quickly as possible in order to avoid defaulting under the MARAD agreement and in view of the start of the hurricane season. It contends that it reasonably concluded, in view of the closed nature of the marine insurance business, that it was most likely to achieve those objectives by working with the existing underwriters and would have risked jeopardizing its position by seeking other insurance markets.[123] It is unnecessary, however, to determine whether its actions were reasonable efforts to mitigate any loss.

As noted, Wartsila did produce some evidence tending to suggest that alternate coverage would have been available. But there is no convincing evidence that the underwriter who gave the lead indication obtained by J & H was aware of the results of the MARSCO study, the fact that LSA had rejected the mooring or, apparently, other negative information concerning the mooring.[124] J & H acknowledged that this information would have had to have been disclosed prior to the underwriting of any coverage.[125] Moreover, it is not even clear that the underwriter in question was prepared to write the coverage without requiring LSA approval.[126] In the circumstances, the Court is not persuaded that alternative coverage would have been available absent the making of the modifications even if Coastal seriously had pursued it.

The work in Puerto Plata began in late April or early May 1996 and concluded in late May or early June.[127]

*Prior Proceedings*

The complaint in this action asserted securities and common law fraud claims as well as claims for negligent misrepresentation, breach of warranty and breach of contract. In an unpublished order dated July 31, 1997, the Court granted defendants' motion for summary judgment to the extent that it dismissed the securities and common law fraud and negligent misrepresentation claims and certain of the warranty and contract claims. It granted plaintiffs' motion for partial summary judgment to the extent that it determined that:

(1) Events occurred prior to the closing, the date as of which the warranties spoke including at a minimum LSA's statement on May 10, 1995 that it would not approve the mooring arrangement beyond June 1, 1995, which reasonably could be expected to have an adverse effect on CEPP. In consequence, assuming the materiality of such an effect, defendants breached the warranties contained in Sections 3.6(xiii), 3.37 and 4.9 of the Purchase Agreement. The issue of materiality was reserved for trial.

(2) Defendants breached the warranty contained in Section 3.17 of the Purchase Agreement because LSA's determination that it would not approve the mooring arrangement was an "event ... which, with the passage of time ... would permit ... the termination of [a] Contract." i.e., the windstorm coverage that was terminated on June 1, 1995.

(3) A condition occurred prior to the closing that reasonably could be expected to have an adverse effect on CEPP. Accordingly, the defendants breached their covenants in Sections 6.1 and 7.1 of the Purchase Agreement *if* the condition was material and

121. In addition to the records references in the preceding notes, *see* DX SS; PX 43; DX Q.

122. *See* PX 50; PX 132.

123. Pl. Post–Trial Mem. 14–15.

124. *See* PX 604 (Spiller Dep.) 100–01, 102–03, 133–34, 151–52.

125. *Id.* 70–71, 118

126. *Id.* 133–34, 161–62, 178–79

127. DX AAAAA; DX FFFFF.

the defendants permitted CEPP to suffer that condition.

## Discussion

### The Warranty Claims

### The Alleged Breaches

The breach of warranty claims that remain following the Court's ruling on the cross-motions for summary judgment are the following:

1. LSA's refusal to approve the mooring and its indication on May 26, 1995 that its approval would require unspecified but significant redesign or enhancements breached the warranties contained in Sections 3.6(xiii) and 3.37 of the Purchase Agreement because it was an event or "fact, circumstance or condition," respectively, prior to closing which "could reasonably be expected to have a Material Adverse Effect on CEPP" and which was not set forth in the Disclosure Schedule or the agreement.[128]

2. The non-fulfillment of the LSA condition in the insurance policies resulted in a breach of the warranty contained in Section 3.17 of the Purchase Agreement because it was an event "which, with the passage of time, would constitute a default by CEPP ... under any Contract or Permit." which permitted termination both of the windstorm coverage and the MARAD financing.[129]

As indicated above, the Court previously granted plaintiffs' motion for partial summary judgment to the extent that it determined that LSA's May 10, 1995 refusal to approve the mooring (a) could reasonably be expected to have an adverse effect on CEPP and therefore breached the warranties contained in Sections 3.6(xiii) and 3.37 if that effect would have been material, and (b) permitted termination of the windstorm coverage and the MARAD financing and therefore

was an event that resulted in a breach of the warranty contained in Section 3.17.

### The Effect of Coastal's Decision to Close Given its Knowledge of the LSA Problem

■ Defendants consistently have argued that Coastal's breach of warranty claims must fail because Coastal knew prior to the closing both that LSA had refused to approve the mooring and that the windstorm coverage was terminable on the very next day. In ruling on the summary judgment motions, the Court rejected that argument. It held that Coastal, by bargaining for defendants' warranties, purchased their "contractual commitment to place [Coastal] in the same economic position that [it] would have enjoyed had the warrant[ies] proved accurate" and that "[t]he justifiability of the [Coastal]'s reliance and the *bona* or *mala fides* of the defendant[s'] actions simply are not in issue." [130] The Second Circuit's subsequent decision in *Rogath v. Siebenmann*,[131] however, requires that this question be revisited.

As *Rogath* makes clear, the question whether a purchaser may recover under New York law for breach of warranty absent reliance long was a subject of dispute and confusion.[132] In *CBS Inc. v. Ziff–Davis Publishing Co.*,[133] however, the New York Court of Appeals held that the purchaser of a business which had received financial statements warranted to be accurate would be entitled to recover for breach of that warranty even if the purchaser had formed doubts as to the truth of the warranted facts prior to the closing.[134] To hold otherwise, it said, "would have the effect of denying the express warranties of their only value to [the purchaser]—i.e., as continuing promises by [the seller] to indemnify [the purchaser] if the facts

---

128. PTO § 4.A. (plaintiffs' contentions), ¶¶ 80–81.

129. *Id.* ¶ 85.

130. Amended order, July 31, 1997, at 3 (citing *Metromedia Co. v.. Fugazy*, 983 F.2d 350, 360 (2d Cir.1992); *CBS, Inc. v. Ziff–Davis Publishing Co.*, 75 N.Y.2d 496, 503–04, 554 N.Y.S.2d 449, 453, 553 N.E.2d 997 (1990)).

131. 129 F.3d 261 (2d Cir.1997).

132. *Id.* at 263–64.

133. 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997.

134. 75 N.Y.2d at 505–06, 554 N.Y.S.2d at 454, 553 N.E.2d 997.

warranted proved to be untrue." [135] In so doing, moreover, it adopted the "basis of the bargain" approach to this issue, holding that "[t]he critical question is not whether the buyer believed in the truth of the warranted information.... but whether [he] believed [he] was purchasing the [seller's] promise [as to its truth]." [136]

Although *CBS* seemed to the settle the issue as a matter of New York law, subsequent decisions in this Circuit have tread a less certain path. In *Galli v. Metz*,[137] the Circuit, in the words of the *Rogath* panel, "delineated fine factual distinctions in the law of warranties," [138] holding that a buyer which "closes on a contract in full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty ... should be foreclosed from later asserting the breach ... unless the buyer expressly preserves his rights." [139] On the other hand, in *Metromedia Co. v. Fugazy*,[140] the Circuit later relied upon *CBS*, without referring to *Galli*, to uphold a trial court's entry of judgment as a matter of law for a plaintiff on a breach of warranty claim, stating that the plaintiff was not obliged to demonstrate reliance on the facts warranted. While the precise basis of the appeal in *Metromedia* was a contention that purchaser had not bargained for the warranty at issue, rather than a claim that the facts warranted had not been relied upon, *Metromedia* nonetheless suggested that the Circuit had abandoned *Galli*'s holding that a buyer loses the benefit of an express warranty by closing unconditionally with knowledge of a breach gained from the seller. *Rogath*, however, now makes clear that the rule of *Galli* survives despite CBS and *Metromedia*.

*Rogath* involved the sale of a painting pursuant to a bill of sale that warranted that the seller was the sole and absolute owner, had full right and authority to transfer the painting, and that the seller had no knowledge of any challenge to its title or to the painting's authenticity.[141] The district court granted summary judgment for the plaintiff, in part on the ground that the seller had been aware of a challenge to the authenticity of the painting over the seller's contention that he had informed the buyer, who in any event knew from another source, that there was an issue as to authenticity. The Court of Appeals reversed on the ground that there were material issues of fact as to what the buyer knew and whence his information, if any, had come. In doing so, it made clear its view that a buyer, under New York law, waives any claim for breach of warranty if the buyer is aware, by reason of the seller's disclosure, of facts constituting a breach but closes without expressly reserving his rights to enforce the agreement.[142] The buyer's awareness of such facts from other sources, however, creates no such difficulty.[143]

Here, Wartsila's Russin directed Reinsch of McGriff, Seibels to inform Coastal that the LSA on May 10, 1995 had refused to approve the mooring. Reinsch did so. Coastal knew also from the Disclosure Schedule that the windstorm coverage was terminable effective June 1, 1995 if LSA approval were not forthcoming.[144] Hence, Coastal was aware from Wartsila of facts that would permit termination of the windstorm coverage and lead to a default under the MARAD financing. Thus, it was aware of TCC's breach of the warranty contained in Section 3.17 of the Purchase Agreement and may not recover on that theory.

The question whether Coastal was aware of events or circumstances that reasonably could be expected to have a Material Adverse Effect on CEPP, and thus aware of breaches of the covenants contained in Sections

**135.** 75 N.Y.2d at 506, 554 N.Y.S.2d at 454, 553 N.E.2d 997.

**136.** 75 N.Y.2d at 503, 554 N.Y.S.2d at 452–53, 553 N.E.2d 997.

**137.** 973 F.2d 145 (2d Cir.1992).

**138.** *Rogath*, 129 F.3d at 264.

**139.** *Galli*, 973 F.2d at.151.

**140.** 983 F.2d 350 (2d Cir.1992).

**141.** 129 F.3d at 263.

**142.** *Id.* at 264.

**143.** *Id.* at 264–65.

**144.** DX DDDDD, ¶ 9.

3.6(xiii), 3.37, and 4.9, is closer. Coastal argues that the question whether the LSA's action ultimately would prove to be a serious or extensive problem was not clear prior to the closing and that Wartsila minimized its significance. In any case, it was ignorant prior to the closing of LSA's May 26, 1995 statement that any further progress would be dependent upon "significant re-design or enhancement of the mooring system." It therefore asserts that its decision to go forward with the closing thus was made in ignorance of highly material facts and that its warranty claim survives at least to this extent. Defendants, on the other hand, point to Smith's May 12, 1995 e-mail, which demonstrates that Coastal was aware that LSA insisted that the mooring be capable of riding out a 100 year storm. They contend that, while the e-mail spoke of the possibility that LSA's concerns might be satisfied by the provision of additional data, it demonstrated that Coastal might incur additional expense "to bring this Mooring into compliance with LSA's standard." Moreover, Rauch's May 16, 1995 memorandum to the Coastal project manager in charge of the acquisition stated that it was "highly unlikely" that LSA would alter its view, thus reflecting awareness that Coastal, if it closed, well might have to upgrade the mooring, and counseled against Coastal taking that risk.

The significance of these documents, the Court finds, is clear. Wartsila advised Coastal of facts indicating a likelihood that Coastal, if it closed, would have to the modify the mooring to satisfy the LSA. While the adjective used by the LSA on May 26— "significant"—was not disclosed *in haec verba*, Coastal knew from what Wartsila did disclose that it was "highly unlikely," to use Rauch's phrase, that LSA could be satisfied by the provision of additional data and, accordingly, that unspecified modifications of uncertain cost probably would be required.

A fact typically is regarded as material if it would "assume[ ] actual significance in the deliberations of a reasonable" buyer.[145] The Court holds that the risk of open-ended liability made apparent to Coastal would assume actual significance in the deliberations of a reasonable purchaser, and Coastal knew it. Accordingly, Coastal closed with knowledge obtained from Wartsila that Wartsila was in breach of the warranty contained in Section 4.9 of the Purchase Agreement and therefore may not recover for that breach.

■ The warranty claim against TCC follows the same analysis save perhaps in one respect. *Rogath* stressed that a buyer's decision to close with knowledge of a breach of warranty defeats the buyer's claim *provided* the information as to the breach comes from the seller. Were *Rogath* read literally, it might be contended that Coastal's warranty claim against TCC survives because Coastal's information concerning the LSA problem came from Wartsila, not TCC. Coastal, however, has not made this contention, which in any case would not be persuasive on the facts of this case.

While TCC nominally was the record owner of the CEPP shares that here changed hands, it was Wartsila that had the principal economic interest in the transaction and, as the designer of the mooring and builder of the plant, was the reservoir of information to which Coastal perforce looked in evaluating the deal. Thus, while TCC in form was the seller, Wartsila was the seller in all practical respects. Certainly *Rogath*, which dealt with a simple bilateral transaction, did not hold that a buyer who closes, without reserving its rights, despite awareness of a breach of warranty gained from the dominant party on the other side of the deal, may proceed against a subordinate party simply because the dominant rather than the subordinate party was the source of the buyer's information.[146]

---

**145.** *See, e.g., TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The Purchase Agreement defined "Material Adverse Change" but did so in circular and therefore uphelpful terms. PX 1, at 7.

**146.** The problem with such a result is well illustrated not only by the case at bar, but by circumstances frequently encountered in the sale of family owned companies where the stock in the business is held principally by a founding family member who runs the business, but small share holdings are owned also by a spouse, children and perhaps other relatives, few if any of whom have any active role in or knowledge of the business. All selling shareholders typically give warranties, often a warranty against undisclosed

Accordingly, Coastal's claims for breach of warranty must be dismissed.

*The Contract Claims*

*Liability*

■ TCC covenanted that it would (1) not suffer, or permit CEPP to suffer, any transaction or condition that could reasonably be expected to have a Material Adverse Effect upon it, (2) use its best efforts to preserve intact CEPP's existing business relationships, and (3) give prompt written notice to Coastal of any occurrence of "any . . . event which with the giving of notice, the passage of time or both would reasonably be expected to constitute a breach or default, with respect to any Contracts . . . of CEPP" or "which would result in . . . any of Seller's representations or warranties . . . being or becoming inaccurate or misleading in any material respect . . ." Wartsila covenanted that it would "take such action within its power to perform" TCC's covenants. Coastal claims that both breached their covenants because they (1) permitted CEPP to suffer a condition likely to have a material adverse effect and failed to use best efforts to preserve CEPP's existing business relationships, in each case by failing to provide LSA with requested information and otherwise to ensure that LSA approval was obtained, and (2) failed to give written notice as required.

The claim against TCC is speedily disposed of. For all practical purposes, Wartsila was in sole charge of CEPP and La Isabela. TCC was simply a financial party. It had no knowledge concerning the mooring, the design, or any of the events relating to the LSA and the windstorm coverage. It simply, and quite reasonably, looked to Wartsila to do what was required. It certainly did not fail to discharge any contractual duty to Coastal.

■ The notice claim against Wartsila also is deficient. LSA's May 10, 1995 announcement that it would not approve the mooring was an event which, with the giving of notice, the passage of time, or both, would result in

a default under the MARAD financing documents and permit termination of the windstorm coverage, both of which were material. There was no written notice. But the lack of written notice gave rise to no damages in view of Reinsch's telephonic advice to Smith, given at Russin's direction, of the LSA's action. The other contract claims against Wartsila, however, are more substantial.

■ The covenant not to permit CEPP to suffer any event or condition that could be expected to have a material adverse impact and Wartsila's affirmative commitment to take such actions as were within its power to preserve CEPP's existing business relationships served an important purpose in this transaction that is best understood in the broader context of the structure of the purchase contract.

Coastal contracted to buy the stock without warranties as to the condition or characteristics of the barge or the mooring, relying instead on its own ability to conduct appropriate due diligence and on the contractual obligations of Wartsila and TCC to give it full access to whatever it needed to form its own judgment about the asset it was buying. In substance, it bought the asset just as most people buy used cars—it relied upon its own ability to assess what it was buying rather than any assurances from the seller. As there was to be a significant interval between the effective date of the purchase agreement and the closing of the transaction, however, the covenants here at issue were bargained-for assurances that Wartsila would not allow the value of the asset, whatever it was, to deteriorate and, indeed, would seek to ensure that one component of the value—existing business relationships—would continue through the closing.

Against this background, it is readily apparent that Wartsila breached its obligations. From May 1994 on, LSA repeatedly pressed Wartsila for justification of its design criteria and for detailed information of various sorts. Some of this information was provided, some in a timely fashion and some after delays;

circumstances likely to have a material adverse effect on the company. It would be absurd to hold that a buyer who decided to close on a purchase without reservation, despite informa-

tion from the dominant shareholder demonstrating the existence of a breach of warranty, nevertheless could proceed against the spouse and other relatives.

much was not. Most notably, site specific environmental data directly responsive to LSA's repeated requests was not provided for many months, and when it finally arrived in the form of the Glenn report, Wartsila withheld it from LSA. These failures led directly to LSA's determination that it would not approve the mooring, an event likely to have a material adverse effect on CEPP and an event attributable in substantial part to Wartsila's unresponsiveness. As the covenants contained in Sections 6.1 and 7.1 in substance obligated Wartsila to do what was necessary, at least within reasonable limits, to avoid the occurrence prior to the closing of an event likely to have a material adverse effect, Wartsila's actions and failures to act were inconsistent with its obligations.

The same reasoning requires the conclusion that Wartsila breached its obligation to take such actions as were within its power to preserve CEPP's existing business relationships. While the outer limits of the obligations undertaken by such a covenant are not entirely clear,[147] this case is not at the uncertain end of the spectrum. Wartsila knew that the windstorm coverage was terminable on the day following the closing absent LSA approval of the mooring. Yet it was considerably less than fully forthcoming in responding to LSA's information requests. That behavior cannot be squared with its obligation to take such actions as were within its power to avoid the termination of the windstorm coverage, the continuation of which was a business relationship within the scope of the covenant.

*Causation and Damages*

Although Wartsila breached certain of its covenants, it contends that the damages claimed by Coastal—the full cost of all of the modifications it ultimately made to the mooring and the incremental cost of keeping the windstorm coverage in force during the interval between its reinstatement and the completion of the modifications—are too remote and therefore not its responsibility.

■ The rules governing damages are easily stated: "Although any breach of contract entitles the injured party at least to nominal damages, he cannot recover more without establishing a basis for an inference of fact that he has been actually damaged."[148] If the fact of damage is established, "the nonbreaching party may recover general damages[,] which are the natural and probable consequence of the breach[,]"[149] as well as special or consequential damages— damages which arise from special circumstances that make them probable, although they would be unusual apart from such circumstances.[150] Under the second rule of *Hadley v. Baxendale*,[151] special or consequential damages may be recovered only if they are "within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."[152] This ease of statement, however, conceals considerable difficulty in application.

■ Wartsila begins its defense by asserting that plaintiffs have failed to establish that they were injured in fact by its breaches— that the breaches were a "but for" cause of the damages.[153] It argues that there is no basis for concluding that any added cost incurred by Coastal was a product of Wartsila's failure to perform according to the letter of its bargain. But the argument is unpersuasive.

**147.** *See, e.g., Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 n. 7 (2d Cir.1979) (considering whether one obligated to use best efforts to sell a product yielding a royalty stream to a promisee is bound to sell the product at a loss).

**148.** 11 Samuel Williston, A Treatise on the Law of Contracts § 1345, at 231 (3d ed.1968) (hereinafter "Williston"); *accord, e.g., Krofft Entertainment, Inc. v. CBS Songs*, 653 F.Supp. 1530, 1534 (S.D.N.Y.1987).

**149.** *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 3, 537 N.E.2d 176 (1989) ("*Kenford II*").

**150.** *E.g., Czarnikow–Rionda Co. v. Federal Sugar Refining Co.*, 255 N.Y. 33, 41–42, 173 N.E. 913 (1930); Restatement (Second) of Contracts § 351, *cmt. b* 1981) (hereinafter "Restatement").

**151.** 9 Exch. 341, 156 Eng.Rep. 145 (1854).

**152.** *Kenford II*, 73 N.Y.2d at 319, 540 N.Y.S.2d at 3–4, 537 N.E.2d 176; *accord*, 11 Williston § 1356, at 291.

**153.** Wartsila Post–Trial Mem. 4.

Translating the far more general language of the covenants that Wartsila breached into terms specific to its defaults, Wartsila's obligation was to ensure, at least within reasonable limits, that LSA was provided with the information it requested to make a timely and informed decision as to whether to approve the mooring, approval which would have eliminated (1) the condition to the underwriters' obligation to continue the windstorm coverage, and (2) the possibility of termination of the MARAD financing for failure to maintain the necessary insurance. It is, as Wartsila argues, impossible to say with certainty what would have occurred had Wartsila responded promptly and fully to LSA's requests. Perhaps LSA, unprovoked by what it took to be Wartsila's unresponsiveness, would have approved the mooring. On the other hand, it is more likely that LSA would not have approved because, in fact, Wartsila did not have site specific data regarding probable environmental conditions until it received the Glenn report just days before the closing and therefore could not justify its environmental loading assumptions. Hence, if Wartsila had performed its obligations, LSA would have withheld its approval, but it would have done so at least several months rather than 20 days prior to the closing.

This delay is critical in assessing causation in this case. One must bear in mind what was going on here. It is true that Wartsila did not warrant the condition of the mooring or that the windstorm coverage would continue as before. Both parties knew that there was a risk that LSA would not approve the mooring and, if that contingency occurred, that something would have to be done if insurance coverage was to remain in place. But the incidence of that risk depended entirely on whether the insurance issue came to a head before or after the closing. If any material problem were to arise before the closing, Coastal would have had the right to terminate the agreement.[154] Hence, the risk would have fallen wholly on Wartsila. If a material problem first became apparent after the closing, on the other hand, the loss would have been borne entirely by Coastal. By

stalling or ignoring LSA's requests for information, Wartsila not only breached its covenants that Wartsila would take such action available to it as would (i) prevent CEPP from suffering any condition likely to have a material adverse effect, and (ii) preserve CEPP's existing business relationships, it deferred the emergence of the insurance problem.

Wartsila's actions, of course, did not entirely postpone the occurrence of any problem with LSA until after the closing. LSA's rejection of the mooring occurred shortly before the closing, so both sides knew that something would have to be done if windstorm coverage was to continue. But the true dimensions of the problem did not even begin to emerge until LSA made its recommendations the next day and were not fully known until after the MARSCO soil study. Hence, Wartsila's breaches prevented the full scope of the problem from being known by the closing date.

The importance of this fact is evident from a comparison of the position which Coastal would have enjoyed absent the breach, even assuming that LSA had not made specific recommendations and no additional soil borings been made, with the position it in fact occupied at the end of May 1995. Had LSA rejected the mooring in the first quarter of 1995, Coastal would have had ample time to explore such matters as the precise nature of LSA's objections, possible compromise with LSA, and the extent and cost of any necessary modifications. It would have had time for further due diligence. Had it learned that the problem was as serious as it ultimately proved to be, it could have terminated the Purchase Agreement or, if Wartsila had been unwilling to risk an effective termination, renegotiated the deal.

By delaying the occurrence of LSA's rejection of the mooring until three weeks before the closing, however, Wartsila seriously prejudiced Coastal's position. It left Coastal with only two practical alternatives, absent Wartsila's agreement to altering the terms of the transaction. The first was to terminate the Purchase Agreement on the premise that

154. PX 1, §§ 9.1–9.2.

LSA's action was a material adverse change—a risky option.[155] The second was to go forward with the closing and thus to run the risk that Coastal, rather than Wartsila, ultimately would have to bear any economic consequences of LSA's action. And by delaying the emergence of the problem, Wartsila radically reduced the information available to Coastal in making that decision, a reduction in information that played a critical role in Coastal's decision to take the risk that it did in closing.

■ The test of causation in fact is one of common sense. In the law of contracts, as in torts, causation in fact is established if the defendant's breach of duty was "a 'substantial factor' in producing the damage."[156] In other words, the test is satisfied if the defendant's actions "would be thought of by people generally as having operated to an important extent in producing the harmful result."[157]

Here, it cannot credibly be denied that the added premiums paid by Coastal to obtain reinstatement and continuation of the windstorm coverage were consequences of Wartsila's breach. This was a $70 million facility in a hurricane-prone location. Few if any reasonable business people would self insure such a risk. A breach of covenants, the almost inevitable effect of which was to produce, only days before a scheduled closing, an event permitting termination of the windstorm coverage at the start of the hurricane season while at the same time minimizing the information available to the buyer in deciding whether to proceed with the transaction, obviously would be regarded as having an important effect in causing the buyer to incur added insurance costs to reinstate the coverage. Indeed, the likelihood that it would do so is sufficiently high to permit the characterization of those added insurance costs as natural and probable consequences of the breach. And it is no answer to say that the added premiums were paid as a result of Coastal's decision, not the timing of LSA's action. Given the position in which Wartsila's actions placed Coastal by delaying and minimizing Coastal's knowledge of the problem, the Court finds that Wartsila's breaches were a substantial factor in producing the increased premiums despite Coastal's decision. on very meager information, to proceed with the closing. Indeed, they were entirely natural and probable consequences.

■ The fact that Wartsila's breaches were not the exclusive cause of Coastal's increased premium costs does not alter this conclusion. The requirement of causation in fact "is not a quest for a *sole* cause. Probably it cannot be said of any event that it has a single causal antecedent; usually there are many. For the purpose of the present inquiry it is enough that the defendant's negligence [or breach] be a cause in fact of the harm."[158] And this view is supported, in the contract context, by *United States Trust Co. of New York v. O'Brien*, which held that a loss of rental income for a period following the end of a tenancy was a natural and probable consequence of the tenant's breach of a covenant to permit the landlord to display a "To Let" sign and show the premises during the tenant's occupancy. The Court of Appeals there held that the trier was entitled to find that the rental loss was caused by the breach, despite the fact that the premises might not have been rented even absent the

---

**155.** While Rauch's May 16, 1995 memorandum demonstrates that Coastal knew prior to the closing that there was a significant risk that Coastal would have to upgrade the moorings, it was not then obvious that the economic consequences of LSA's action were likely to be sufficiently great to be "material" within the meaning of the relevant provisions of the Purchase Agreement. Hence, had Coastal terminated the contract purely on the basis of what it knew of the LSA action, it would have risked a claim by Wartsila and TCC that its termination was wrongful and that Coastal was liable for the difference between the contract price and the price at which La Isabela I ultimately might have been sold.

**156.** *Krofft Entertainment, Inc. v. CBS Songs,* 653 F.Supp. 1530,1534 (S.D.N.Y.1987) (quoting Charles McCormick, Handbook on the Law of Damages § 73, at 261 (1935) (hereinafter "McCormick")); *see also United States Trust Co. of New York v. O'Brien,* 143 N.Y. 284, 287–88, 38 N.E. 266 (1894) (rule of damages not dependent on form of action).

**157.** McCormick § 73, at 263.

**158.** 2 Fowler V. Harper & Fleming James, Jr., The Law of Torts § 20.2, at 91 (2d ed.1986) (original emphasis).

breach, because any other conclusion would have deprived the covenants of their value.[159]

So too here. Among the objects of the covenants Wartsila breached, as applied to these particular circumstances, was to ensure, as far as possible, that any difficulty affecting the insurance coverage would occur before Coastal assumed ownership of the facility. To deny recovery on the theory that Wartsila's delays did not alone cause Coastal to pay increased insurance premiums would be "to deprive the covenants of most of their value."[160]

Very much the same analysis yields the conclusion that Wartsila's breaches were causes in fact of the additional costs incurred in modifying the mooring. Wartsila's breaches effectively put Coastal in the position of choosing, without knowing the severe requirements that LSA first would impose on the day following the closing, between trying to back out of the deal at the last minute and going ahead in the face of uncertainty. Once it chose the latter course, it was quite likely that it would be forced to modify the mooring to satisfy LSA, as other coverage probably could not be obtained in the face of LSA's refusal to approve the facility. In these circumstances. Wartsila's breaches, although obviously not the sole cause of the modifications, "operated to an important extent in producing the harmful result."[161] Accordingly, they were a cause in fact of Coastal's injury. But that is not the end of the analysis, as causation in fact is a necessary but not sufficient basis for Coastal's recovery of the modification costs.

In other circumstances, the next step would be to determine whether the modification costs were natural and probable consequences of Wartsila's breaches as distinguished from special or consequential damages, a troublesome enterprise given the "relativity of causation" and the inability in modern life to know "where the ordinary ends and the extraordinary begins ..."[162] On the particular facts of this case, however, it is unnecessary to undertake that task.

These parties both knew on the date as of which the contract was effective that LSA might or might not approve the mooring. They knew that acts or omissions that would delay a decision until after the deal had closed would place the entire economic risk inherent in rejection on Coastal. They knew or, at any rate, are deemed to have known [163] also that acts or omissions that would delay a decision until shortly before the closing probably would leave the parties just where they wound up—in an ambiguous situation, marked by imperfect information, in which it would be unclear whether Coastal had the right to terminate and equally unclear as to whether modifications of modest cost would suffice. It was quite likely that a party in that position would proceed with the closing, as Coastal did. The cost of modifications that then proved necessary to continue the windstorm coverage therefore were foreseeable consequences of its actions well within the contemplation of the parties at the time they entered into the Purchase Agreement.

Wartsila argues that the parties could not reasonably have foreseen the need to make modifications, especially modifications as extensive as Coastal made, because they could not have foreseen, among other things, that (1) LSA would not have relented and accepted Wartsila's design criteria, (2) LSA's postclosing recommendations would have been as stringent as they were, (3) the existing underwriters would not have waived the requirement of LSA approval or agreed to the use of a different surveyor, more favorably inclined toward Wartsila, (4) Coastal would have new soil borings made, (5) the new borings would reveal the inaccuracy of the soil strength assumptions, and (6) Coastal would be required to spend $1.8 million on

159.   143 N.Y. at 288–90, 38 N.E. 266.

160.   *Id.* at 290, 38 N.E. 266.

161.   McCormick § 73, at 263.

162.   *Kerr S.S. Co. v. Radio Corp. of Am.*, 245 N.Y. 284, 290, 157 N.E. 140 (1927).

163.   *See Spang Industries, Inc., Fort Pitt Div. v. Aetna Cas. & Sur. Co.*, 512 F.2d 365, 369 (2d Cir.1975); *Leonard v. N.Y., Albany & Buffalo Electro–Magnetic Tool Co.*, 41 N.Y. 544, 567 (1870).

additional insurance premiums and modifications, largely as a result of the allegedly unforeseeable soil deficiencies.[164]

Wartsila's contention that the circumstances it relies upon were not foreseeable to it is unpersuasive. While it perhaps was conceivable that LSA would approve the mooring despite foot-dragging, it was far more likely that it would not. Given LSA's insistence on justification for Wartsila's environmental loading criteria, especially in the form of site specific wind, wave and tide data, it was entirely foreseeable that Wartsila's failure to provide the necessary information would result in LSA taking the conservative position, i.e., imposing environmental assumptions sufficiently stringent to protect the underwriters against the severest of imaginable storms. In view of the underwriters having conditioned the continuation of the windstorm coverage on LSA approval, there is no reason to suppose that their waiver of that condition or agreement to a less demanding surveyor was anything more than a faint hope. And Wartsila's denial of the foreseeability of the discover of the soil strength deficiency and all that flowed from that discovery is not credible. Treu of AOI had warned Wartsila that the soil strength assumptions on the basis of which the mooring was designed were based on inadequate data. He pointedly asked whether Wartsila

would take responsibility for proceeding in the face of this obvious failing. Thus, the chain of events that unfolded here was entirely foreseeable to Wartsila.[165]

The same fairly may be said as to Coastal.[166] While Coastal, perhaps imprudently, obtained no warranties as to the condition of the barge and mooring, it did protect itself to some degree against loss of the windstorm coverage by obtaining the covenants that were breached here in that it obtained Wartsila's commitment, in substance, to do what it could to obtain LSA approval. It was as foreseeable to Coastal as to Wartsila that a failure by Wartsila to take timely and reasonable steps to procure LSA approval quite likely would leave the owner of the barge, as a practical matter, in the position of having to make whatever modifications LSA insisted upon in order to continue the coverage. And while Coastal was unaware of Treu's warnings to Wartsila about the soil strength issue, it certainly was foreseeable that disapproval by LSA based upon Wartsila's failure to produce sufficient information on a timely basis quite possibly could result in a thorough review of all of the relevant engineering and environmental considerations bearing on the adequacy of the mooring. And that is all that is required. "There is no requirement that the breach itself or the particular way

164. Wartsila Post–Trial Mem. 8–9.

165. All of this was foreseeable to Wartsila at the time the Purchase Agreement was entered into. *See* III FARNSWORTH § 12 .14, at 245. The underwriters' conditioning of continuation of the windstorm coverage, LSA's demands for justification and Treu's warnings concerning the inadequacy of the soil strength data all antedated the contract.

166. It is far from clear that the foreseeability of the loss to Coastal is material. In *Hadley*, Baron Alderson indicated his view that consequential damages are available only where they "may reasonably be supposed to have been in the contemplation of both parties ... as the probable result of the breach of" the contract. 9 Exch. at 354, 156 Eng.Rep. at 151. Certainly there are *dicta* to the same effect in New York cases. *E.g., Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 374, 590 N.Y.S.2d 425, 429, 604 N.E.2d 1356 (1992) (quoting *Hadley*). On the other hand, Professor Farnsworth states that "it is now accepted" that "it is foreseeability only by

the party in breach that is determinative." III FARNSWORTH § 12.14, at 245. This is the view adopted by the Restatement, RESTATEMENT § 351, and it finds support in New York cases as well. *E.g., Charles E.S. McLeod, Inc. v. R.B. Hamilton Moving and Storage*, 89 A.D.2d 863, 864, 453 N.Y.S.2d 251, 253 (2d Dept.1982) (damages recoverable are those "which at the time of the making of the contract the defendant had reason to foresee would be a natural and probable consequence of the breach"); *see Spang Indus., Inc.*, 512 F.2d at 370–71. This view is consistent, moreover, with what Judge Posner has described as the "animating principle" of *Hadley v. Baxendale*, "that the costs of the untoward consequence of a course of dealings should be borne by that party who was able to avert the consequence at least cost and failed to do so." *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 956 (7th Cir.), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (1982). As the Court has found, however, that the damages sustained here were foreseeable to Coastal at the time of the making of the contract, it is unnecessary to resolve this issue.

that the loss came about be foreseeable." [167]

There is another way of viewing this issue that produces the same result. Had Wartsila discharged its obligations, LSA probably would have rejected the mooring several months before the closing. As business of this sort is conducted, the virtually inevitable result would have been a renegotiation of the Purchase Agreement in which the parties would have sought to divide the costs of continuing the insurance coverage. One measure of Coastal's damages therefore is the difference between what it actually spent and what it would have spent had LSA's rejection come much earlier.

We of course cannot know how that negotiation would have ended, save to say that it is far more likely than not that Coastal would have borne only part of the added costs, as Wartsila admittedly was anxious to sell the plant. But on these facts, that uncertainty must be borne by Wartsila. As the New York Court of Appeals and, in another context, the Supreme Court have held, "when it is certain that damages have been caused . . . and the only uncertainty is as to their amount. there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever . . ." [168] It does not " 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." [169] Where the defendant's actions are "of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." [170] That is exactly the case here. By delaying LSA's decision, Wartsila effectively deprived Coastal of information and time necessary to either terminate the transaction or insist upon a reallocation of the loss. It cannot now escape liability by arguing that the extent of the loss it thus inflicted is uncertain.

Accordingly, this Court finds that the added insurance premiums paid to reinstate and keep the windstorm coverage in effect pending the resolution of the problem concerning the mooring and the cost of upgrading the mooring to satisfy LSA's environmental loading criteria, given the actual soil conditions rather than the soil conditions incorrectly assumed by Wartsila in designing the mooring, were foreseeable consequences of Wartsila's breach of the Purchase Agreement. The total amount, which is not seriously in dispute, is $1,821,465.57.[171]

*Waiver*

■ Wartsila contends that Coastal's decision to close without raising the issue created by LSA's disapproval of the mooring waived its claim for breach of contract. The argument is without merit.

---

167. III Farnsworth § 12.14, at 245.

168. *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 496 (2d Cir.1995) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N.Y. 205, 209, 4 N.E. 264 (1886)); *see also J. Truett Payne Co. v. Chrysler Motors Co.,* 451 U.S. 557, 565–67, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 561–66, 51 S.Ct. 248, 75 L.Ed. 544 (1931)

169. *J. Truett Payne,* 451 U.S. at 566–67, 101 S.Ct. 1923 (quoting *Hetzel v. Baltimore & Ohio R. Co.,* 169 U.S. 26, 39, 18 S.Ct. 255, 42 L.Ed. 648 (1898) (quoting *United States Trust Co. v. O'Brien,* 143 N.Y. at 289, 38 N.E. 266) (certain internal quotation marks omitted)).

170. *Story,* 282 U.S. at 563, 51 S.Ct. 248; *accord, e.g., Thalle Const. Co. v. Whiting–Turner Contr. Co.,* 39 F.3d 412, 418–19 (2d Cir.1994).

171. PX 500, ¶¶ 10–17; PX 502, ¶ 6.

It should be noted that most of the expenses were paid by CEPP, not Coastal. Plaintiffs maintain that they nevertheless may recover these amounts on the theory that they measure the extent to which the value of the CEPP stock they purchased was overstated by reason of the breaches of contract. *E.g.,* PTO, § IX; PX 500, ¶ 17. Wartsila has not disputed this theory of recovery, although it denies liability and contends that plaintiffs have waived their claims and failed to mitigate their damages. *E.g.,* PTO § IV.B., ¶¶ 62–63, at 87–88. In consequence, the Court finds that the amounts paid by CEPP and the plaintiffs as a proximate consequence of Wartsila's breaches of contract accurately measure the diminution in the value of plaintiffs' CEPP stock attributable to those breaches.

"A waiver is the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved."[172] Thus, Wartsila cannot prevail absent convincing proof that Coastal knew that Wartsila had breached its covenants and that it intended to give up any right to relief for those breaches by closing on the Purchase Agreement.

Neither requirement is satisfied here. To begin with, all Coastal knew by the date of the closing was that LSA had declined to approve the mooring. It did not know that Wartsila had failed to respond in a timely and reasonable fashion to its repeated efforts to obtain information. Thus, it did not know that Wartsila was in breach. In any case, the Court credits Barry's testimony that Coastal did not intend to sacrifice its rights by proceeding with the closing. In consequence, there was no waiver of the claim for breach of the covenants.[173]

*Mitigation*

■ Wartsila contends that Coastal failed to mitigate its damages by failing to pursue the possibility of other insurance coverage which might have been available without the need to make any modifications to the mooring.

■ A plaintiff in a contract case is required to take reasonable actions to minimize its damages.[174] But the defense of failure to mitigate requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages.[175]

Here, it is arguable that Coastal's failure to explore alternatives in the insurance market was unreasonable, although its assertion that it would have had to disclose the LSA situation to any other broker or underwriter and justified its decision cannot be rejected out of hand. But there is no need to determine this issue, as Wartsila has not sustained its burden of proving that Coastal could have found alternate insurance that would have avoided the need to make the modifications here at issue. The evidence upon which it relies simply is too tentative and indirect to persuade the Court of the correctness of its position. Moreover, it did not establish even that the lead indication that J & H allegedly procured was from an underwriter who knew the material facts and was prepared to write the coverage without requiring LSA approval of the mooring.

*Attorneys' Fees*

■ Section 14.3 of the Purchase Agreement obligates Wartsila to "protect, defend, indemnify and hold harmless each Person to whom a ... covenant is made hereunder ... in respect of any and all Claims it shall incur or suffer, which arise, result from or relate to any breach of ... any of its ... covenants." Coastal maintains that it is entitled under this provision to the attorneys' fees incurred by it in prosecuting this action.

In *Hooper Associates, Ltd. v. AGS Computers, Inc.*,[176] the New York Court of Appeals noted that attorneys' fees ordinarily "are incidents of litigation" and may not be recovered from the losing party absent agreement between them, statute or rule.[177]

---

**172.** *Liebowitz v. Elsevier Science, Ltd.*, 927 F.Supp. 688, 705 (S.D.N.Y.1996) (quoting *Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York*, 61 N.Y.2d 442, 446, 474 N.Y.S.2d 458, 459–60, 462 N.E.2d 1176 (1984)).

**173.** This point, unlike the claim for breach of warranty, is not controlled by *Rogath* and *Galli*. Those cases stand only for the proposition that one who closes in full knowledge, disclosed by the seller, of a breach of warranty—that is, in full knowledge from the seller that the facts extant on the date of the closing are not consistent with the state of affairs warranted to exist by the seller—will not be heard to complain. Here, Coastal knew that there was no LSA approval, but it did not know that its absence reflected breaches of covenants by Wartsila.

**174.** *E.g., Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985); *Slotkin v. Citizens Cas. Co. of N.Y.*, 614 F.2d 301, 313 (2d Cir.1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980).

**175.** *Air et Chaleur*, 757 F.2d at 494; *Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20, 26 (2d Cir.1983).

**176.** 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989).

**177.** *Id.* at 491, 549 N.Y.S.2d at 366, 548 N.E.2d 903.

It went on to hold that a contractual obligation to indemnify for attorneys' fees should not be inferred unless the intention to indemnify "is unmistakably clear from the language of the promise."[178] It concluded that the language of the contract before it was the sort typically associated with an obligation to reimburse for payments made on third-party claims and rejected the plaintiff's claim for attorneys' fees against the other contracting party.[179]

Coastal argues that the indemnification clause here at issue, unlike that in *Hooper Associates*, evidences an intention to include within the indemnity an obligation by Wartsila to pay Coastal's cost in suing it. It asserts that the term "Claim" is defined to include any action or suit without limitation as to the identity of the parties.[180] It notes that Section 14.4 requires each Indemnified Party, upon obtaining knowledge of facts that *it* may have a basis for a Claim, to give notice to the Indemnifying Party. And it argues that Section 14.4 further provides that the failure to give notice shall not affect the right of the Indemnified Party to indemnification "except in the case of third party claims or where defendants or otherwise harmed by such failure."[181] This, it suggests, evidences a clear intention to distinguish only in this proviso between (i) claims between parties to the agreement and (ii) third-party claims and, in consequence, that the indemnity obligation extends to attorneys' fees with respect to claims between parties to the agreement.

Coastal's argument perhaps would be more persuasive if the proviso in Section 14.4 actually contained the language used in Coastal's paraphrase. But it does not. It says only that the right to indemnification survives a failure to give notice "unless (i) the Indemnified Party has proceeded to contest, defend or settle the Claim with respect to which it has failed to give prior notice to the Indemnifying Party or (ii) the Indemnifying Party is otherwise harmed or damaged by such fail-

ure." Clause (i) thus does not quite make precisely the distinction between third-party claims and claims among the parties to the agreement that Coastal proposes. Rather, it simply sets forth the common sense proposition that an Indemnified Party which fails to give notice and then undertakes to defend or settle the claim cannot look to the Indemnifying Party to pay the cost.

Once the proviso in Section 14.4 is placed in proper context, the resolution of this issue is relatively straightforward. The language of the agreement certainly is susceptible of the interpretation that Coastal would place upon it. The word "Claim" is defined so broadly as to include attorneys' fees incurred by it. This case certainly arises or relates to breaches of covenant by Wartsila, so Coastal's attorneys' fees in pursuing it are a "Claim" within the language of Section 14.3. But the clear message of *Hooper Associates* is that this is not enough. There is no language clearly evidencing an intention that the loser in a suit for breach of the Purchase Agreement was intended to pay the winner's attorneys' fees. In consequence, Coastal's claim must be rejected.

*Prejudgment Interest*

Prejudgment interest is governed by New York law both because this is a diversity, case and because the Purchase Agreement contains a New York governing law clause.[182] Accordingly, Coastal is entitled to prejudgment interest at the rate of 9 percent per annum from the later of the earliest date the cause of action existed and the date upon which damages were incurred.[183] Where, as here, the damages were incurred at various times, interest may be computed on each item from the date on which it was incurred or from a single reasonable intermediate date.[184]

In this case, the added insurance premiums paid by Coastal, which totaled $161,-612.91 were incurred in the period June 26

**178.** *Id.* at 492, 549 N.Y.S.2d at 367, 548 N.E.2d 903.

**179.** *Id.*

**180.** PX 1, § 1.1, at 4.

**181.** Pl. Post–Trial Mem. 20.

**182.** PX 1, § 16.9(a).

**183.** N.Y. CPLR §§ 5001(a), 5001(b), 5004.

**184.** *Id.* § 5001(b).

through November 1, 1995.[185]  The engineering, construction and related costs paid in connection with modifying the mooring were incurred almost entirely in the period December 6, 1995 through July 5, 1996.[186]  Accordingly, the Court fixes May 15, 1996 as the reasonable intermediate date from which prejudgment interest will be computed.

### Conclusion

For the foregoing reasons, plaintiffs shall recover judgment against defendant Wartsila Diesel Development Corporation in the amount of $1,821,465.57, together with interest thereon at the rate of 9 percent from May 15, 1996 to the date of the judgment and the costs of this action.  The complaint, insofar as it is brought against defendant Transcontinental Capital Corporation, is dismissed with prejudice and without costs.

The foregoing contains the Court's findings of fact and conclusions of law in accordance with Rule 52(a).

SO ORDERED.

---

**185.**  PX 502, ¶ 6.

**186.**  The $1,492,018.25 in construction costs all was paid in the period March 7 through July 5, 1996.  PX 500, ¶¶ 10–11;  PX 423–28. The timing of the other expenses is set forth in PX 500 and PX 411, 413–15, 417, 431–35, 441–45, 451–53, and 461–62 and in PX 502.